**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Moses TOOTICK, Defendant–Appellant.**

**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Charles Evans FRANK, Defendant–Appellant.**

Nos. 90–30140, 90–30142.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 8, 1991.

Decided Dec. 17, 1991.

John E. Storkel, Storkel & Grefenson, Salem, Or., for defendant-appellant Tootick.

Stephen R. Sady, Chief Deputy Federal Public Defender, Portland, Or., for defendant-appellant Frank.

William Youngman, Asst. U.S. Atty., Portland, Or., for plaintiff-appellee.

Before GOODWIN, ALARCON and HALL, Circuit Judges.

GOODWIN, Circuit Judge:

Charles Frank and Moses Tootick were jointly tried and convicted of assault resulting in serious bodily injury under 18 U.S.C. § 113(f) and 1153. They appeal on the ground that the district court erred in denying their timely motions for severance made before and during trial. 736 F.Supp. 1047. Frank also argues on appeal that the court erred in permitting the jury to hear the incriminating statement given by Tootick to the police.

## I

Aaron Hart was stabbed on the Warm Springs Indian Reservation, after a night of drinking with Frank and Tootick. Hart was also run over by an automobile at the scene of the stabbing. He survived and testified.

Hart testified that Frank stabbed him. The government's case also included testimony by several of Frank's relatives. One of Frank's sisters testified that, on the morning of the assault, an intoxicated and emotionally upset Frank had arrived at her home with Tootick and said that he and Tootick had just killed someone. Frank then informed her of his intention to flee to Canada. She further testified that she had noticed blood on one of Frank's hands and that later that afternoon she had driven to Portland to bring Frank and Tootick back to Warm Springs where they surrendered to reservation police. The sister's husband confirmed most of her testimony and added that Tootick had nodded his head when Frank asked him whether they had just killed someone. A second sister of Frank testified that Frank and Tootick had arrived at her home the morning of the incident. She said that Frank had appeared frightened and had revealed the location of the stabbing, which she afterward confirmed by driving there and finding Hart.

The roommate of one of Frank's cousins testified that, at a party several hours before the assault, Frank and Tootick had openly expressed their intention to cut Hart. The cousin explained that Frank had passed Tootick a knife which Tootick had then placed in his pocket. According to the cousin, both Frank and Tootick were visibly intoxicated. Later at the trial, Frank's nephew testified that Frank and Tootick had arrived at his house in Portland and that Frank had stated that he and Tootick might have killed somebody. Another witness who was present at the house in Portland testified that Tootick had asked to wash his shirt, one sleeve of which was stained with blood.

## II

■ Federal Rule of Criminal Procedure 8 allows the joinder of defendants who are alleged to have committed the same crime. Generally, defendants who are indicted together in federal court should be jointly tried. *United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

Joinder is favored in federal criminal cases largely for reasons of judicial economy and efficiency, despite some degree of bias inherent in joint trials. *See United States v. Walker*, 720 F.2d 1527, 1533 (11th Cir.1983), *cert. denied*, 465 U.S. 1108, 104 S.Ct. 1614, 80 L.Ed.2d 143 (1984); *Parker v. United States*, 404 F.2d 1193, 1196 (9th Cir.1968), *cert. denied*, 394 U.S. 1004, 89 S.Ct. 1602, 22 L.Ed.2d 782 (1969). Rule 14 states, however, that if codefendants are prejudiced by joinder, the trial court may order severance.

■ We review a denial of severance for abuse of discretion. *United States v. Sherlock*, 865 F.2d 1069, 1078 (9th Cir. 1989). Defendants must meet a heavy burden to show such an abuse, and the trial judge's decision will seldom be disturbed. *See Escalante*, 637 F.2d at 1201. Merely showing that a comparative advantage would result from separate trials will not satisfy this burden. *United States v. Adler*, 879 F.2d 491, 497 (9th Cir.1988); *Escalante*, 637 F.2d at 1201. In deciding whether reversal is required, the defendant must show that joinder " 'was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial.' " *United States*

*v. Ramirez,* 710 F.2d 535, 546 (9th Cir.1983) (quoting *United States v. Abushi,* 682 F.2d 1289, 1296 (9th Cir.1982)).

■ In this case, both defendants claim that their antagonistic and mutually exclusive defenses resulted in reversible prejudice. Mere inconsistency in defense positions is insufficient to find codefendants' defenses antagonistic. *United States v. Mazzanti,* 888 F.2d 1165, 1172 (7th Cir. 1989), *cert. denied,* 495 U.S. 930, 110 S.Ct. 2167, 109 L.Ed.2d 497 (1990). Inconsistency, alone, seldom produces the type of prejudice that warrants reversal. The probability of reversible prejudice increases as the defenses move beyond the merely inconsistent to the antagonistic.

■ Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other. *Adler,* 879 F.2d at 497. "The prototypical example is a trial in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime." *United States v. Holcomb,* 797 F.2d 1320, 1324 (5th Cir.1986). In *United States v. Crawford,* 581 F.2d 489 (5th Cir.1978) the court found mutually exclusive defenses where defendants, charged with possession of an unregistered firearm, each claimed that the other owned the weapon. *Id.* at 491–92.

■ In the present case, the principle defense of each defendant was that the other alone committed the assaults. Frank swore that he drove to an isolated spot at the side of a hill and remained in the car while Tootick, to his surprise, stepped out with Hart and stabbed him. Frank testified that he watched in horror as codefendant Tootick repeatedly stabbed Hart and then licked Hart's blood off the weapon.

Tootick did not testify. Tootick's lawyer claimed that his client was highly intoxicated and was either passed out or was asleep during the entire episode.

While Tootick did not directly accuse his codefendant, he gave a statement to the police concerning his state of intoxication. That statement was used to fashion a mutually exclusive defense. Mutual exclusivity may exist when "only one defendant accuses the other, and the other denies any involvement." *United States v. Romanello,* 726 F.2d 173, 177 (5th Cir.1984). For a proclamation of innocence to constitute an accusation, the facts of the dispute must be closed in a fashion that does not suggest the intervention of some unknown actor.

Because only Frank and Tootick were present when Hart was attacked, and because there was no suggestion that Hart injured himself, the jury could not acquit Tootick without disbelieving Frank. Each defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other.

### III

When severance is requested on the ground that mutually exclusive defenses require it, the trial court must consider the substantial possibility of prejudice. *See United States v. Peveto,* 881 F.2d 844, 857 (10th Cir.), *cert. denied,* 493 U.S. 943, 110 S.Ct. 348, 107 L.Ed.2d 336 (1989); *Romanello,* 726 F.2d at 181; *Crawford,* 581 F.2d at 492. Language in several Ninth Circuit opinions suggests that a finding of mutually exclusive defenses requires severance under Rule 14. *United States v. Sherlock,* 865 F.2d 1069, 1081 (9th Cir.1989); *Adler,* 879 F.2d at 497 ("Severance is required when conspirators' defenses are mutually exclusive ..."); *Ramirez,* 710 F.2d at 546 ("Only where the acceptance of one party's defense will preclude the acquittal of the other party does the existence of antagonistic defenses mandate severance."); *United State v. Gonzales,* 749 F.2d 1329, 1333–34 (9th Cir.1984). The defendants argue that these cases establish a per se rule mandating severance whenever mutually exclusive defenses are pled. In none of the cited cases, however, does the language pertaining to severance constitute a holding. The present case is the first occasion in which this Circuit is required to decide whether severance is mandated in the context of mutually exclusive defenses.

■ Ninth Circuit law provides general guidance in testing discretion in the refusal

to sever trials. "The party seeking reversal of a decision denying severance under Rule 14 has the burden of proving 'clear,' 'manifest,' or 'undue' prejudice from the joint trial." *Escalante*, 637 F.2d at 1201 (citations omitted). The types of prejudice that mandate severance undermine the procedural fairness of the trial. Consequently, the defendant "must show that the magnitude of the prejudice denied him a fair trial." *Ramirez*, 710 F.2d at 546. In more concrete terms, reversible prejudice exists when one of the defendant's "substantive rights," such as the "opportunity to present an individual defense," is violated. *Escalante*, 637 F.2d at 1201.

■ Prejudice cannot be understood in a vacuum. The touchstone of the court's analysis is the effect of joinder on the ability of the jury to render a fair and honest verdict. Prejudice will exist if the jury is unable to assess the guilt or innocence of each defendant on an individual and independent basis.

> Rather, the ultimate question is whether under all of the circumstances, it is within the capacity of the jurors to follow the court's admonitory instructions and, correspondingly whether they can collate and appraise the independent evidence against each defendant solely upon the defendant's own acts, statements, and conduct.

*United States v. Brady*, 579 F.2d 1121, 1128 (9th Cir.1978), *cert. denied*, 439 U.S. 1074, 99 S.Ct. 849, 59 L.Ed.2d 41 (1979).

The joinder of defendants advocating mutually exclusive defenses can have a prejudicial effect upon the jury, and hence the defendants, in a number of ways.

Defendants who accuse each other bring the effect of a second prosecutor into the case with respect to their codefendant. In order to zealously represent his client, each codefendant's counsel must do everything possible to convict the other defendant. The existence of this extra prosecutor is particularly troublesome because the defense counsel are not always held to the limitations and standards imposed on the government prosecutor. Opening statements, as in this case, can become a forum in which gruesome and outlandish tales are told about the exclusive guilt of the "other" defendant. In this case, these claims were not all substantiated by the evidence at trial. Counsel can make and oppose motions that are favorable to their defendant, without objection by the government.

Cross-examination of the government's witnesses becomes an opportunity to emphasize the exclusive guilt of the other defendant or to help rehabilitate a witness that has been impeached. Cross-examination of the defendant's witnesses provides further opportunities for impeachment and the ability to undermine the defendant's case. The presentation of the codefendant's case becomes a separate forum in which the defendant is accused and tried. Closing arguments allow a final opening for codefendant's counsel to portray the other defendant as the sole perpetrator of the crime.

Joinder can provide the individual defendants with perverse incentives. Defendants do not simply want to demonstrate their own innocence, they want to do everything possible to convict their codefendants. These incentives may influence the decision whether or not to take the stand, as well as the truth and content of the testimony.

The joint trial of defendants advocating mutually exclusive defenses produces fringe benefits for the prosecution. Joinder in these cases can make a complex case seem simple to the jury: convict them both.

The government's case becomes the only unified and consistent presentation. It presents the jury with a way to resolve the logical contradiction inherent in the defendants' positions. While the defendants' claims contradict each other, each claim individually acts to reinforce the government's case. The government is further benefited by the additive and profound effects of repetition. Each important point the government makes about a given defendant is echoed and reinforced by the codefendant's counsel.

Joinder of defendants who assert mutually exclusive defenses has a final subtle

effect. All evidence having the effect of exonerating one defendant implicitly indicts the other. The defendant must not only contend with the effects of the government's case against him, but he must also confront the negative effects of the codefendant's case.

## IV

■ While the joinder of trials in which defendants maintain mutually exclusive defenses produces heightened dangers of prejudice, we decline to adopt a per se rule against joinder in such cases. Instead, we hold that in order to establish an abuse of discretion, the defendants must demonstrate that clear and manifest prejudice did in fact occur.

■ After carefully reviewing the transcript, we find that the joint trial of Frank and Tootick resulted in reversible prejudice with respect to each defendant. The jury could not have been able to assess the guilt or innocence of the defendants on an individual and independent basis. This conclusion rests on the number and types of prejudicial incidents that were not corrected by instructions from the court. Both convictions are reversed.

On the first day of trial, the judge gave the usual instruction that the statements of counsel are not evidence. The second day began with the opening statement on behalf of defendant Charles Frank. No new instructions were provided to make it clear that the opening statements *of the defendants* were not evidence, despite the certainty that the unbridled accusations from the codefendant's counsel would constitute one of the greatest threats of prejudice in a trial with mutually exclusive defenses.

Frank's counsel proceeded to present the core of his defense: Moses Tootick, acting alone, repeatedly stabbed the victim, Aaron Hart, while Charles Frank stood by, shocked and horrified.

> He [Frank] looked and he saw Moses Tootick on Aaron Hart and some terrible things were happening. He stopped the car a short period—short distance in front is where events were occurring,

and he looked on in horror. He was horrified with what he saw and he started leaning over to pull up the window. He was afraid of Mr. Tootick getting in . . .

After Frank's opening statement, the court proceeded immediately to the opening statement on behalf of the defendant, Moses Tootick. There was no instruction that the defendant's opening statements were not evidence. Counsel was given virtually uncontrolled leave to portray Frank as the sole guilty party.

> *He* [Charles Frank] was saying things even though Aaron Hart—such as "I'm going to get you, you're mine tonight, I'm going to kill you." These are the kind of things that *Charles Frank* was saying to Aaron Hart.

> *Charles Frank* decided that to carry out what *he* intended to do *he* was going to have to have a weapon of some kind. *He* went out to the van, got a knife and at this point *he* began to—*He* was not as intoxicated as Moses Tootick was. So *he* began to formulate a plan.

> .     .     .     .     .

> *Charles Frank* was driving. *Charles Frank* was alert enough to know exactly what *he* was doing. *He'd* got the knife from Moses Tootick. *He* got into an argument with Aaron Hart. *He* began to viciously slice and stab Aaron Hart.

> .     .     .     .     .

> *Charles Frank* knows exactly what's happened, *he* thinks that *he's* killed Aaron Hart. *He* is worried now about who's going to get blamed, who's going to take responsibility for what happened.

> .     .     .     .     .

> *He's* [Charles Frank] formulated the plan of, hey, I'm going to blame Moses Tootick for this. I'm going to say that Moses Tootick did this when in fact *he* was the one who did it.

> .     .     .     .     .

> When Aaron Hart was in the emergency room at the St. Charles Medical Center, the F.B.I. interviewed him. They obviously wanted to know what happened. They wanted to know how he got these

horrible wounds. And when special agent Stuart was interviewing Aaron Hart he asked, you know, who did this to you? And Aaron Hart said, "Hot Dog did it."

And the agent asked, "Well, who's Hot Dog?" And Aaron Hart made a very specific statement, he said "that's *Charles Frank*." And he said *"he's* the person that works on the slash crew for the Warm Springs Mill." And then again he states that he would press charges against *Frank* because *Frank* had tried to kill him. And he says to the agent, "Look what *he* did to me; *he* tried to kill me." He said, "that's what *Charles Frank* did." Never makes a single statement about Moses Tootick.

And after the incident, after he's had a chance to recuperate somewhat from his wounds, he's interviewed again. And during that interview again he's saying that *Charles* was the person who slashed him across the stomach, *Charles* was the person who slashed him across the chest, *Charles* was the person that ran the knife into his shoulder. That's who the victim remembers as doing these particular crimes.

.    .    .    .    .

That in fact *Charles Frank* planned this, intended to do it, the victim said *he* did it, and after it was all done *he* tried to cover it all up and *he's* still trying to cover it up in the courtroom today. *He's* trying to shift the blame to Moses Tootick when in fact *he's* the one who committed this crime.

All totaled, in the course of the opening statement, Tootick's counsel refers to Charles Frank twenty-five times by name, and seventy-two times by the use of personal pronouns. After this highly inflammatory opening statement, the trial judge proceeded directly to call for the government to present its case. No admonitory comments were made to the jury. No additional instructions were provided. Not once in the entire course of the morning proceeding did the court reiterate the generic instruction that lawyer talk is not evidence.

Very few of the explicit and detailed allegations made in Tootick's opening statements were substantiated with evidence during the trial. Among the unsubstantiated claims was a tale of a dramatic rescue of Aaron Hart by Tootick, credited with saving Hart's life. In a motion for a mistrial based upon Tootick's opening statements, Frank's counsel argued that if the government had taken such liberties with the facts that "you would have declared a mistrial in a flash." Frank's counsel argued that there was now a second prosecutor in the room, a prosecutor who was not constrained by the standards imposed upon the government. The motion was denied and no remedial instructions were provided.

Counsel for Frank "fought fire with fire." He repeatedly used his cross-examination of government witnesses to reiterate the prosecution's charges against Tootick and to emphasize Tootick's guilt. The following is an example of the exchange between Frank's lawyer and government witness Carolyn Parra.

Q: And Mr. Frank told you that Moses Tootick had stabbed someone?

A: Yes.

.    .    .    .    .

Q: Did he [Tootick] say that he had stabbed him 23 times?

A: Yes.

.    .    .    .    .

Q: And he again told you that Moses had stabbed Aaron?

A: Yes.

Tootick's counsel behaved in a similar fashion. At times he used his cross-examination of the government witnesses to incriminate Frank. On other occasions, Tootick's counsel tried to rehabilitate the government's position after Frank's cross-examination.

Frank took the stand in his own defense. He testified that he saw Tootick commit the crime. In addition to describing the details of the incident, Frank testified—after being prompted by his attorney—that Tootick proceeded to lick the blood off of the knife after the attack.

I seen—It had a lot of blood on it. And he [Moses Tootick] started laughing kind of funny, kind of weird laughter, and he got the knife and he started licking the blood off the knife. And while he was doing that, he was laughing crazy. (demonstrating) He was—he was—kinds of sound like he was nuts, crazy.

This testimony was allowed over the objection of Tootick's counsel that it was far more prejudicial to Mr. Tootick than it was probative. Tootick's counsel pointed out that it was essentially a "self-serving statement on the part of Mr. Frank," an effort to inflame the jury against his client. We do not say that the evidence was not admissible. We merely observe its prejudicial impact.

In closing argument, the defendants again maintained mutually exclusive positions and traded incriminating accusations. Frank's attorney attempted to undermine Tootick's defense and to portray Tootick as the sole perpetrator of the crime. "He [Tootick] was awake, he clearly was the person who inflicted the injury." Tootick's attorney made similar efforts, but the closing arguments were substantially less animated than the opening statements.

The government's closing argument, not surprisingly, rested on the logical impossibility of accepting both defendants at their word. The prosecutor's sarcasm was not subtle.

Moses Tootick was too drunk to form intent to do this and Charles Frank didn't have anything to do with it. We've been wasting our time here for two days. We should have just gone home yesterday.

The core of the government's argument was that it was impossible for the jury to accept both of the defendants at their word.

These guys didn't do anything, according to them. I mean, they each want you to find them not guilty. But then what do

we do about this? I mean, what do we do, just—too bad, Aaron. Moses, he was drunk and he didn't mean to do that to you. And the other guy, he didn't do it, so Aaron, we're just going to go home, just let you—let you wonder.

It is assumed that juries will listen to and follow the trial judge's instructions. *Escalante,* 637 F.2d at 1202. With proper limiting instructions, even the admission of a nontestifying codefendant's confession can be found not to create prejudice, so long as the confession is not facially incriminating. *Richardson v. Marsh,* 481 U.S. 200, 211, 107 S.Ct. 1702, 1709, 95 L.Ed.2d 176 (1987). In order to neutralize prejudice, however, the instructions must be proper and timely. *See Sherlock,* 865 F.2d at 1080 ("Although the court gave the limiting instructions *before* closing arguments, no instructions followed the prosecutor's prejudicial remarks.") (emphasis in original). The judge must actively supervise the trial and, if necessary, reiterate instructions in the wake of prejudicial events. *Id.*

The trial court's instructions in this case were not sufficient to neutralize the effects of the prejudicial incidences. The relevant instructions consisted of brief statements to the effect that arguments were not evidence, given only at the traditional times, and a generic instruction pertaining to joint trials, given at the end of the trial.[1] No cautioning instructions were given directly after the damaging opening arguments of the respective defendants. No reins were placed on defendants' respective counsel as they acted as unsanctioned prosecutors during the course of the trial. Finally, the court remained silent as the prosecutor relied upon the mutually exclusive nature of the codefendants' defenses in an effort to nail down their mutual guilt in his closing argument. Under these circumstances, a set of lengthy and accurate instructions delivered at the end of the trial are re-

---

**1.** At the end of the trial the following paragraph was included in the set of instructions provided to the jury.

Although the defendants are being tried together, you must consider the case against each separately. In doing so, you must decide what the evidence showed about each defendant without considering any evidence that may have been received solely against some other defendant or defendants. Each defendant is entitled to have the case against that defendant decided solely on the evidence and the law which applies to that defendant.

ceived by a jury that has already been numbed by the conflicting defenses and is ready to believe nobody.

This court recognizes that "[j]oint trials play a vital role in the criminal justice system." *Richardson*, 481 U.S. at 209, 107 S.Ct. at 1708. The joint trial of defendants pleading mutually exclusive defenses raises heightened risks that the defendants may be prejudiced. It is incumbent upon the trial judge to take appropriate steps to ensure that the jury determines the guilt or innocence of each defendant on an individual and independent basis. Safeguards were inadequate in this case. Because the defendants have demonstrated that the trial, as conducted, resulted in manifest prejudice, we hold that the trial court's failure to sever constituted an abuse of discretion. Consequently, the convictions of both defendants are reversed.

Because we remand for separate trials, it is not necessary to address Frank's contention that the trial court erred in permitting the jury to hear the statement given by Tootick to the police.

REVERSED and REMANDED.