65 F.3d 176
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Steven James FLEENER, Defendant-Appellant.
UNITED STATES of America, Plaintiff-Appellee,
v.
James Edward FLEENER, Defendant-Appellant.
 Nos. 94-10481, 94-10490.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted July 13, 1995.
Decided Aug. 16, 1995.
 
 Before: SNEED, CANBY, and FERNANDEZ, Circuit Judges.
 
 
 1
 MEMORANDUM*
 
 
 2
 James Fleener and his brother, Steven Fleener, appeal their convictions for bank robbery. Appellants claim that the district court erred by denying their motions for severance and by sentencing them as career offenders under the Sentencing Guidelines. James Fleener also argues that the district court erred by refusing to declare a mistrial and that the fruits of the search incident to his arrest should have been suppressed because probable cause to arrest him was lacking. We affirm.
 
 I.
 FACTS AND PROCEEDINGS BELOW
 
 3
 At about 1:30 p.m. on February 8, 1994, the Chase Bank on North 32nd Street in Phoenix, Arizona, was robbed. The robber was a white male, wearing an Oxford shirt, jeans, a baseball hat, and sunglasses, and talking loudly into a cellular telephone. He demanded money from two tellers, Jane Farmer and Shelli Elledge. They gave him approximately $4,000 in cash, including several bait bills, which he carried in his free hand.
 
 
 4
 When the robber left the bank, he was pursued by two bank employees, Paul Thurrott and Ryan Dylong. In his haste, the robber dropped some of the money and the sunglasses, which were retrieved shortly afterwards by another witness, Joseph Calvano. Thurrott and Dylong chased the robber through the parking lot but hesitated when he disappeared behind the corner of a nearby power substation. At that point, they heard the sound of a car door slamming and wheels screeching as a car sped away. When they looked around the corner, the robber was gone.
 
 
 5
 Meanwhile, Jeff Nicks was driving a cable company van on 31st Street when he noticed a car approaching him, driving slowly. He saw a man, the robber, emerge from behind the power substation and jump into the passenger seat of the car, which slowed but did not stop to pick him up and then sped away. Nicks then saw Thurrott and Dylong and guessed that they were chasing the man. His suspicions aroused, Nicks alertly turned around and followed the car, taking down its license plate number. He also saw the man throw a piece of clothing out the car window. He then called the police on his car phone and told them what he had seen. The police directed him back to the bank; on the way, Nicks thoughtfully retrieved the shirt that the robber had thrown out of the car.
 
 
 6
 About forty-five minutes after the robbery, police stopped the car bearing the license number that Nicks had identified. Steven Fleener ("Steven") was alone, driving the car. Steven was arrested and both he and the vehicle were searched, but no evidence of the bank robbery was discovered. Steven initially claimed that he had been job-hunting in the area of Chase Bank, but backed down from that story when pressed. Eventually, he admitted that he had been with his brother at the McDonald's restaurant next door to the bank around the time of the robbery.
 
 
 7
 The police took Steven back to the bank to allow the witnesses to identify him. The results were inconclusive. Both tellers, Elledge and Farmer, said that Steven was not the robber; however, the men who chased the robber out of the bank, Thurrott and Dylong, both positively identified Steven as the robber. Later that evening, Elledge, Farmer, and Thurrott were each individually shown a photographic lineup that included a photograph of Steven's brother, James Fleener ("James"). Farmer did not make an identification, but Elledge and Thurrott both identified James as the robber.[1]
 
 
 8
 The following day, February 9th, the police located James and arrested him. In his pants pocket was a large roll of bills, including seven bait bills that were traced to the bank robbery. In addition, a cellular telephone similar to the one carried by the robber was found in James' pickup truck.
 
 
 9
 James and Steven were indicted on March 8, 1994, for bank robbery in violation of 18 U.S.C. Sec. 2113(a) and aiding and abetting under 18 U.S.C. Sec. 2. The government's theory was that James had entered the bank and robbed it, and Steven had driven the getaway car. Prior to trial, James' counsel moved to exclude Steven's post-arrest statement that he had been with James in the area of the bank around the time of the robbery because of the Bruton problem. The trial judge decided that as long as no mention were made of James specifically, the government could introduce testimony that Steven had said he was in the area with another person.
 
 
 10
 During opening statements, Steven's counsel, James Logan, defied the court's ruling and told the jury, "Steven Fleener told the police he was in the area with his brother." Immediately after Logan finished, the judge excused the jury for a recess and chastised Logan for referring to the excluded portion of Steven's statement. Rather than declare a mistrial or sever the defendants, the judge called the jury back in and instructed them a second time that opening statements were not evidence. The trial then proceeded.
 
 
 11
 After a two-day trial, both brothers were convicted. At their respective sentencing hearings, the court found both men to be career offenders under the Sentencing Guidelines. James was sentenced to 210 months in prison, Steven to 164 months. Each was also sentenced to a period of supervised release for 36 months, and required to pay $1,572.92 in restitution and a $50.00 fine.
 
 
 12
 James and Steven timely appeal their convictions. This court has jurisdiction under 28 U.S.C. Sec. 1291.
 
 II.
 DISCUSSION
 A. Severance
 
 13
 James and Steven argue that the district court erred in refusing to order separate trials under Rule 14 of the Federal Rules of Criminal Procedure.[2] The district court's decision not to sever is reviewed for an abuse of discretion. United States v. Baker, 10 F.3d 1374, 1386 (9th Cir.1993), cert. denied, 115 S.Ct. 330 (1994). "The test for abuse of discretion by the district court is whether a joint trial was so manifestly prejudicial as to require the trial judge to exercise his discretion in but one way, by ordering a separate trial." Id. at 1387 (internal quotations omitted). The scope of review is thus "extremely narrow." Id. We find that the district court acted within its discretion.
 
 
 14
 Obviously, "[s]ome prejudice is inherent in any joinder of defendants." United States v. Smith, 893 F.2d 1573, 1581 (9th Cir.1990). To be entitled to reversal of the court's denial of their motion to sever, Appellants must prove such "clear, manifest or undue prejudice from the joint trial that [it] violates one of [their] substantive rights, so that the prejudice is of such a magnitude that [they were] denied a fair trial." United States v. Vasquez-Velasco, 15 F.3d 833, 845 (9th Cir.1994). Neither James nor Steven alleges prejudice that rises to this level.
 
 
 15
 According to Appellants, severance was required because their defenses were "mutually antagonistic": Each maintained that the other had actually gone into the bank and robbed it. Their defenses were not mutually antagonistic as that phrase is ordinarily understood, however; it generally means that "acceptance of one party's defense will preclude the acquittal of the other party." United States v. Koon, 34 F.3d 1416, 1436 (9th Cir.1994) (citation and internal quotation marks omitted), petition for cert. filed, 63 U.S.L.W. 3756 (Apr. 10, 1995) (No. 94-1664). Such was not the case here. The government presented evidence that both were involved in the robbery, James as the holdup man and Steven as the driver of the getaway car. Both could be found guilty of bank robbery, without regard to which brother actually entered the bank.
 
 
 16
 Moreover, even if we were to conclude that the brothers' defenses were mutually antagonistic, the Supreme Court has ruled that such conflicting defenses do not mandate severance. Zafiro v. United States, 113 S.Ct. 933, 938-39 (1993).[3] Even "[m]utually antagonistic defenses are not prejudicial per se." Id. at 938.
 
 
 17
 Nevertheless, Appellants argue that they were prejudiced by a joint trial. They rely on United States v. Tootick, 952 F.2d 1078 (9th Cir.1991).[4] However, that case is distinguishable. There, the Ninth Circuit found that the district court had failed to take steps to mitigate the prejudice caused by, among other things, one codefendant's inflammatory and unsubstantiated opening statement inculpating the other codefendant, and the prosecution's closing argument, which mocked the defendants for trying to pin the blame on each other. Id. at 1084-86. As a result, reversal was required. The court held that "[t]he judge must actively supervise the trial and, if necessary, reiterate instructions in the wake of prejudicial events." Id. at 1085.
 
 
 18
 Rule 14 thus does not mandate severance even where prejudice is shown; "rather, it leaves the tailoring of the relief to be granted, if any, to the district court's sound discretion." Zafiro, 113 S.Ct. at 938. The Court recognized that "less drastic measures [than severance], such as limiting instructions, often will suffice to cure any risk of prejudice." Id.
 
 
 19
 Unlike the court in Tootick, the district judge in this case took steps to avoid prejudice to Appellants. After Steven's counsel improperly referred to Steven's post-arrest statement that James had been with him, the district judge, as mentioned above, immediately instructed the jury a second time that opening statements were not evidence. The court's instructions were "proper and timely," and therefore adequate to "neutralize" the prejudice caused. Tootick, 952 F.2d at 1085; see also United States v. Sherlock, 962 F.2d 1349, 1362 (9th Cir.1989) (holding that where the court failed to instruct the jury after the prosecutor improperly referred to an excluded portion of codefendant's confession during closing arguments, the defendant was "significantly prejudiced" and entitled to a new trial), cert. denied, 113 S.Ct. 419 (1992).
 
 
 20
 In addition, Steven argues that the joint trial prevented him from introducing evidence relevant to his defense, in particular (1) the remainder of his own post-arrest statement that he was with James at the time of the robbery; (2) the testimony of James' girlfriend that James told her in a telephone conversation that he was with Steven; and (3) a copy of James' prior armed robbery conviction.[5] In Steven's view, the evidence is crucial to his argument that James robbed the bank, and that Steven had no prior knowledge of it.
 
 
 21
 This argument is unpersuasive. First, as the district judge noted, none of this evidence would exculpate Steven; rather, it would further inculpate James. Second, because the prosecution's own theory was that James was the actual robber, and their evidence supported this version of events, the evidence Steven sought to admit was essentially cumulative. And finally, the exclusion of this evidence in no way prevented Steven from arguing unconvincingly that he was not involved, but rather just happened to be driving past the bank when his brother emerged with a fistful of cash and jumped into the car. Thus, we find that Steven was not prejudiced by the exclusion of these items of evidence as a result of the joint trial.
 
 B. Mistrial
 
 22
 James argues that the introduction of the portion of Steven's statement inculpating James violated his confrontation rights under Bruton, and therefore the district court erred in not declaring a mistrial. The district court's decision denying a motion for mistrial is reviewed for an abuse of discretion. United States v. Homick, 964 F.2d 899, 906 (9th Cir.1992). The government argues that the district judge did not err in denying the motion for mistrial. We agree.
 
 
 23
 The government contends that the statement at issue does not expressly implicate James in the robbery and therefore does not even fall within the scope of Bruton. We need not reach that argument, however. Even assuming that the district court did err in not declaring a mistrial, that error was harmless beyond a reasonable doubt because "[t]he other evidence at trial was overwhelming, the court gave a curative instruction, and the comment was an isolated one." United States v. Taren-Palma, 997 F.2d 525, 532 (9th Cir.1993) (refusing to reverse defendant's conviction where codefendant's counsel improperly referred to inadmissible evidence inculpating defendant in his opening statement), cert. denied, 114 S.Ct. 1648 (1994); see also United States v. Monks, 774 F.2d 945, 955 (9th Cir.1985) (same). In this case, the other evidence against James was strong: He was identified by two witnesses in a photo lineup and at trial, he was arrested carrying money that had been stolen in the robbery, and a cellular telephone like the one used in the crime was found in his truck. As previously mentioned, the reference to Steven's statement occurred only once, and the court reinstructed the jury immediately afterwards.
 
 C. Career Offender Status
 
 24
 Appellants challenge the district judge's determination that they are both "career offenders" under the Sentencing Guidelines. Briefly, both contend that they do not have "at least two prior felony convictions of ... a crime of violence" as required for career offender status under Sec. 4B1.1(3).[6]
 
 
 25
 1. James.
 
 
 26
 The district court agreed with the conclusion of the Presentence Report that James was a career offender because he had two prior state felony convictions for crimes of violence, one for armed robbery and one for misconduct involving weapons. James, however, contends that his conviction for misconduct involving weapons is not a "crime of violence" for purposes of Sec. 4B1.1. "The district court's determination that [James] is a career offender, as an interpretation of the Guidelines, is subject to de novo review." United States v. Becker, 919 F.2d 568, 570 (9th Cir.1990), cert. denied, 499 U.S. 911 (1991); accord United States v. Innie, 7 F.3d 840, 849 (9th Cir.1993), cert. denied, 114 S.Ct. 1567 (1994). We affirm the district court's determination that James is a career offender.
 
 
 27
 This court uses the "categorical approach" to determine whether James' predicate conviction for misconduct involving weapons is a crime of violence. Innie, 7 F.3d at 849. Under this approach, "we do not look to the specific conduct which occasioned [James'] conviction[ ], but only to the statutory definition of the crime." Becker, 919 F.2d at 570. The Arizona statute under which James was convicted provides: "A person commits misconduct involving weapons by knowingly ... [m]anufacturing, possessing, transporting, selling or transferring a prohibited weapon." Ariz.Rev.Stat.Ann. Sec. 13-3102. The "prohibited weapon" that James was convicted of possessing, a sawed-off shotgun, is defined by the statute as a "shotgun with a barrel length of less than eighteen inches." Ariz.Rev.Stat.Ann. Sec. 13-3101(d).
 
 
 28
 James' offense, to constitute a crime of violence under the Guidelines, must be one that "involves conduct that presents a serious potential risk of physical injury to another." USSG Sec. 4B1.2(1)(ii).[7] This circuit has held that possession of an unregistered sawed-off shotgun is a crime of violence for purposes of the career offender provisions of the Guidelines. United States v. Hayes, 7 F.3d 144 (9th Cir.1993), cert. denied, 114 S.Ct. 1403 (1994). The Hayes court reasoned that "sawed-off shotguns are inherently dangerous, lack usefulness except for violent and criminal purposes and their possession involves the substantial risk of improper physical force." This brings the offense within the purview of Sec. 4B1.1.
 
 
 29
 James seeks to distinguish Hayes because the offense there at issue involved an unregistered sawed-off shotgun.[8] This argument fails. The Hayes decision turns not on whether the gun is registered, but on the dangerous nature of the weapon.[9] A sawed-off shotgun, registered or not, "presents a serious potential risk of physical injury to another." USSG Sec. 4B1.2(1)(ii); see also Huffhines, 967 F.2d at 321 (holding that the unlawful possession of a silencer presents such a risk and thus is a crime of violence).
 
 
 30
 James finally argues that if the statute does not require proof that the gun was unregistered, his conviction cannot be considered a crime of violence under the categorical approach. This argument is unavailing, for two reasons. First, as already pointed out, registration is not necessary to establish that a weapons possession charge can constitute a crime of violence. However, registration can be raised as an affirmative defense under the statute. James evidently did not raise this defense. Therefore, his conviction stands. We will not reexamine the facts supporting that conviction in order to entertain a claim that he could have raised a defense but failed to do so.
 
 
 31
 2. Steven.
 
 
 32
 Steven argues that the court erred by determining that he had two prior convictions for crimes of violence. He maintains there was only one. In support of this contention, he argues that his sentences for robbery in Arizona and California are "related" as defined by Sec. 4A1.2(a)(2), and therefore should be treated as just one prior conviction. Whether two cases are related for purposes of the Guidelines is a mixed question of law and fact subject to de novo review. United States v. Taylor, 984 F.2d 298, 300 (9th Cir.1993); United States v. Davis, 922 F.2d 1385, 1388 (9th Cir.1991). "[P]rior sentences are considered related if they resulted from offenses that (1) occurred on the same occasion, (2) were part of a single common scheme or plan, or (3) were consolidated for trial or sentencing." USSG Sec. 4A1.2(a)(2), comment. (n. 3).
 
 
 33
 Steven argues that but for the fact that two in the series of seven robberies occurred in Arizona instead of California, all seven would have been consolidated into one proceeding. As it happened, the five California robberies were consolidated in that jurisdiction, as were the two robberies prosecuted in Arizona. Because they would have been consolidated were it not for the jurisdictional bar, Steven maintains, the district court erred in not treating both sentences as a single prior sentence. We reject this argument.
 
 
 34
 The Ninth Circuit has held, as Steven contends, that in certain circumstances the district court should treat as related prior sentences that were not subject to a formal consolidation order. This is a narrow, technical exception, however. Specifically, it applies where a defendant received identical concurrent sentences in the same court during one proceeding; those two sentences should be considered consolidated, despite the fact that technically they retained separate docket numbers and files. United States v. Hummasti, 986 F.2d 337, 339 (9th Cir.), cert. denied, 113 S.Ct. 2984 (1993); United States v. Chapnick, 963 F.2d 224, 228-29 (9th Cir.1992). Such is not the case here. Steven's sentences for the crimes in Arizona and California were not identical, though they were imposed concurrently, and the two sentences were handed down in separate proceedings in different state tribunals before different judges. It is certainly possible that they would have been consolidated had all the robberies occurred in one state, but that is mere speculation.
 
 
 35
 Steven also relies on United States v. Houser, 929 F.2d 1369 (9th Cir.1990). That case is inapposite, however. The issue in Houser was whether two separate convictions should be considered related because they involved a "common scheme or plan." Id. at 1374. In finding that they did involve a common scheme, the court noted that the cases would have been tried together in one county had the two drug sales not taken place in two different counties. Id. However, "[i]t was the nature of the offenses which was controlling [in Houser ]...." Davis, 922 F.2d at 1390 (emphasis added). Unlike Houser, Steven's case does not involve "mere geographical separation" because Steven's crimes were clearly not part of a "common scheme or plan"[10] sufficient to make them "related" under the Guidelines. See id.
 
 D. Probable Cause to Arrest James
 
 36
 James contends finally that the evidence obtained upon his arrest should be suppressed because the officers lacked probable cause to arrest him. This claim is meritless.
 
 
 37
 The district court's probable cause determination is reviewed de novo, accepting the court's factual findings unless clearly erroneous. United States v. Arzate-Nunez, 18 F.3d 730, 735 (9th Cir.1994). "Probable cause exists when police officers have reasonably trustworthy information sufficient to warrant a prudent person in believing that the accused had committed or was committing an offense." United States v. Harvey, 3 F.3d 1294, 1296 (9th Cir.1993) (internal quotation marks and citation omitted), cert. denied, 114 S.Ct. 1100 (1994). The court looks to "the totality of the circumstances known to the officers prior to any search conducted incident to the arrest." Id.
 
 
 38
 Contrary to his contention, James was not arrested simply because his brother was a suspect in the robbery. To repeat what has gone before, Steven was discovered shortly after the robbery driving the vehicle identified as the getaway car. He told the police that James had been with him in the area of the bank around the time it was robbed. The police knew that at least two people were involved, since the robber was seen jumping into the passenger seat of the car that sped away from the scene. Two witnesses, including one of the bank tellers who had presumably gotten a good look at the robber, identified James' photograph in a lineup. The bank teller's identification of the person who robbed her was itself sufficient for probable cause to arrest James. See id. Under the totality of the circumstances, the police clearly had probable cause to arrest James. "Neither certainty, nor proof beyond a reasonable doubt, is required for probable cause to arrest." Id. at 1296.
 
 
 39
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 At trial, Thurrott identified James as the robber. Elledge identified Steven on direct examination, but during cross-examination by Steven's attorney she conceded that she had pointed out the wrong person, and identified James as the robber
 
 
 [2]
 The government contends that Steven waived the severance issue by not raising it at the close of evidence, but the record shows that his counsel did move for severance again at that time
 
 
 [3]
 In Zafiro, the defendants, a boyfriend and girlfriend, each claimed that a suitcase full of illegal drugs found in the girlfriend's apartment belonged to the other, and that each had no knowledge of it or the other's drug-dealing. 113 S.Ct. at 936. The Court rejected their claim that the district court's refusal to sever was an abuse of discretion. Id. at 939
 
 
 [4]
 Appellants also contend that being forced to face a "second prosecutor" in the form of their codefendant necessarily prejudices them. See Tootick, 952 F.2d at 1082. This, however, is simply a reiteration of the argument that mutually antagonistic defenses should always require severance, which the Supreme Court rejected in Zafiro
 
 
 [5]
 Presumably to support his theory that he had no prior knowledge of the robbery, Steven sought to introduce James' prior conviction to show his own state of mind regarding what James was up to when he saw James running from the bank carrying a fistful of money
 
 
 [6]
 Section 4B1.1 provides:
 A defendant is a career offender if (1) the defendant is at least eighteen years old at the time of the instant defense, (2) the instant offense is a felony that is either a crime of violence or a controlled substance offense, and (3) the defendant has at least two prior felony convictions of either a crime of violence or a controlled substance offense.
 USSG Sec. 4B1.1.
 
 
 [7]
 The misconduct involving weapons offense does not meet the first definition of a "crime of violence" under Sec. 4B1.1, because it does not include "as an element the use, attempted use, or threatened use of physical force against the person of another." See USSG Sec. 4B1.2(1)(i); United States v. Huffhines, 967 F.2d 314, 320 (9th Cir.1992) (applying same analysis to similar state statute banning possession of a silencer)
 
 
 [8]
 The Hayes court specifically declined to address whether the offense of being a felon in possession of a sawed-off shotgun is a crime of violence. Id. at 144
 
 
 [9]
 The Guidelines specifically provide that "[t]he term 'crime of violence' does not include the offense of unlawful possession of a firearm by a felon." USSG Sec. 4B1.2 comment. (n. 2) (emphasis added). It is clear from the case law, however, that this provision does not exempt possession of weapons that are "inherently dangerous and lacking in lawful purposes" and therefore constitute a crime of violence. See Hayes, 7 F.3d at 144; Huffhines, 967 F.2d at 321
 
 
 [10]
 Although the robberies arguably took place "within a short period of time," they involved different victims, some were armed robberies and others were not, and they were investigated by two different law enforcement agencies and prosecuted by separate agencies in Arizona and California. See Davis, 922 F.2d at 1390