State of Nebraska, appellee, v.
Jeremy D. Foster, appellant.
___ N.W.2d ___

Filed November 15, 2013.    No. S-10-1228.

1.  **Trial: Joinder.** There is no constitutional right to a separate trial.
2.  **Trial: Joinder: Proof: Appeal and Error.** The burden is on the party challenging a joint trial to demonstrate how and in what manner he or she was prejudiced.
3.  **Trial: Joinder: Appeal and Error.** A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion.
4.  **Trial: Joinder: Indictments and Informations.** The propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.
5.  **Trial: Joinder: Juries.** A court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.
6.  **Trial: Joinder: Proof.** To prevail on a severance argument, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.
7.  ____: ____: ____. A defendant must show that a joint trial caused him or her such compelling prejudice that he or she was deprived of a fair trial.
8.  **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.
9.  **Trial: Evidence: Joinder.** The existence of mutually antagonistic defenses is not prejudicial per se.
10. **Trial: Joinder: Proof.** In order to be entitled to severance based on mutually exclusive defenses, the defendant must show real prejudice, rather than merely note that each defendant is trying to exculpate himself or herself while inculpating the other.
11. **Criminal Law: Aiding and Abetting: Trial: Evidence.** The fact that one codefendant was defending against the charge of aiding and abetting the other codefendant in committing the underlying crime does not necessarily create mutually exclusive defenses.
12. **Criminal Law: Aiding and Abetting.** Aiding and abetting is simply another basis for holding an individual liable for the underlying crime.
13. ____: ____. Neb. Rev. Stat. § 28-206 (Reissue 2008) provides that a person who aids or abets may be prosecuted and punished as if he or she were the principal offender.
14. **Trial: Waiver: Appeal and Error.** The failure to make a timely objection waives the right to assert prejudicial error on appeal.

15. **Rules of Evidence: Hearsay: Proof.** Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.

16. **Hearsay: Extrajudicial Statements.** An extrajudicial statement not offered to prove the truth of the matter asserted is not hearsay.

17. **Constitutional Law: Criminal Law: Trial: Witnesses.** In all criminal prosecutions, the accused shall enjoy the right to be confronted with the witnesses against him or her.

18. **Criminal Law: Witnesses: Testimony.** Statements to friends, relatives, accomplices, and anyone outside the criminal justice system are not testimonial.

19. **Criminal Law: Witnesses: Testimony: Intent.** A statement that is not intended for use in the prosecution of a crime and that law enforcement had no role in obtaining is not testimonial.

20. **Trial: Juries.** When a case is finally submitted to the jury, jury members must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court.

21. **Trial: Juries: Waiver.** A defendant can waive the right to sequester the jury.

Appeal from the District Court for Douglas County: Peter C. Bataillon, Judge. Affirmed.

Glenn Shapiro and Michael J. Wilson, of Schaefer Shapiro, L.L.P., for appellant.

Jon Bruning, Attorney General, and Stacy M. Foust for appellee.

Wright, Connolly, Stephan, McCormack, and Miller-Lerman, JJ., and Cassel, Judge.

Wright, J.

## I. NATURE OF CASE

Jeremy D. Foster was charged with one count of murder in the first degree, four counts of assault in the second degree, and five counts of use of a deadly weapon to commit a felony. His codefendant, Darrin D. Smith, was charged with the same crimes, and the two were tried jointly. A jury convicted both Smith and Foster on all counts, and they were each sentenced to life imprisonment plus 96 to 150 years. Smith and Foster perfected timely separate appeals to this court. Because each has assigned different errors and makes distinct arguments, we address the two appeals in separate opinions, addressing errors in the order assigned by the respective appellant. We affirm Foster's convictions and sentences.

## II. FACTS

### 1. BACKGROUND

The following facts are relevant to Foster's appeal: Brothers Victor Henderson and Corey Henderson belonged to the "Pleasantview" or "PMC" gang in Omaha, Nebraska. Smith was a member of the rival "40th Avenue" gang.

Corey and Victor were federally indicted and agreed to plead guilty and testify for the government in exchange for more lenient sentencing. When they were released from federal prison in 2007, they were considered "snitches" within the gang community.

Following their release, Corey and Victor saw Smith at a party in October 2008. Smith told Corey: "We don't fuck with your kind." About 2 weeks before the shooting, Corey and Victor saw Smith again at an American Legion hall in Omaha (the Legion). The Legion is considered a bar for Corey and Victor's gang. Smith made another statement to the effect of "we don't mess with your kind."

On November 9, 2008, Corey, Victor, and several of their family members went to the Legion. While Corey and Victor were there, Smith and Foster entered the bar wearing hooded sweatshirts. Smith and Foster were in the Legion approximately 10 minutes, and before they left, they looked and nodded toward Corey and Victor.

Around closing time, Victor attempted to break up a fight in the parking lot of the Legion. Smith and Foster returned, and Corey and Victor were shot. The evidence was in conflict as to whether Foster or Smith was the shooter. Officers responded to the Legion and found a chaotic scene. Victor was fatally shot in the neck, and four others were wounded.

Within a month, Smith and Foster were arrested. Both were charged with one count of first degree murder, four counts of second degree assault, and five counts of use of a deadly weapon to commit a felony.

### 2. PRETRIAL MOTIONS

On April 9, 2010, over the objection of both defendants, the district court sustained the State's motion to consolidate. Later, the court sustained Smith's motion to sever, but subsequently

reconsolidated the trials. Before trial, both defendants again moved to sever, arguing that they would be required to "point the finger" at each other. The State asserted that it planned to prosecute the defendants based on a theory that they acted together. The court overruled both motions.

### 3. TRIAL TESTIMONY

Neither defendant testified at trial. Both defendants proceeded mainly by cross-examining witnesses called by the State. We summarize the relevant trial testimony below.

### (a) Robert Wiley

Officer Robert Wiley received a call at 12:44 a.m. on November 10, 2008. Upon responding to the call, Wiley found Victor lying in blood with a gunshot wound to his neck.

At trial, Wiley testified that soon after arriving on the scene, he observed a woman screaming, "It was D-Wacc, it was D-Wacc." The court sustained two of Smith's objections and instructed the jury to disregard Wiley's testimony about what the screaming individual said. Foster did not object to this testimony.

Later, the State asked Wiley to describe the demeanor of the person screaming and state what she said. Smith objected on hearsay and confrontation grounds, but Foster did not. The State claimed the statement fell under the excited utterance exception to the hearsay rule. Smith's objection was overruled, and Wiley proceeded to testify that the party was screaming, "It was D-Wacc," over and over again.

### (b) Corey Henderson

Corey testified that he knew Smith as "D-Wacc." He explained that he and Smith had grown up together, that there was a fairly close connection between Victor's and Smith's families, and that Victor had fathered children with Smith's cousin. Victor and Smith were on good terms. Over Smith's objection, Corey also testified that Smith had been a member of the 40th Avenue gang from the time Smith was approximately 13 years old up through the shooting. Corey explained that in 2003 and 2004, Corey and Victor were federally indicted. They cooperated with the federal government

and testified against members of Smith's gang in exchange for lighter prison sentences. As a result, Corey and Victor were labeled as "snitches" and received threats. Following their release from federal prison, Corey and Victor primarily associated with their family members and continued to associate with members of the Swift family.

Despite mainly associating with family, Corey testified than they saw Smith on several occasions before the shootings. In October 2008, Corey and Victor saw Smith at a party where, after Corey acknowledged Smith, Smith stated, "We don't fuck with your kind." At trial, Foster did not object to Corey's testimony about Smith's statement or request a limiting instruction.

Corey testified that he and Victor next saw Smith 2 weeks before the shootings. Corey and Victor went to the Legion, where Corey noticed Smith on the dance floor. They stayed only about 30 minutes. As Corey walked out, he saw that a group of males had surrounded Victor outside of a car, including Smith, "Don Don" Swift, and a boy of about 14, who each had a gun. "Don Don" was arguing with Victor. At some point, Corey heard Smith say, "We don't fuck with y'all kind. They ain't tripping off that other stuff. We just don't fuck with y'all kind." Corey understood this to be a comment about Corey and Victor's being "snitches." Foster did not object to this testimony about Smith's statements outside the Legion or request a limiting instruction.

On the night of November 9, 2008, Corey and Victor were at the Legion. While there, Corey saw Smith and Foster come into the Legion wearing hooded sweatshirts with the hoods pulled over their heads. Smith wore a black hooded sweatshirt. Foster wore a gray hooded sweatshirt, was light skinned, had braided hair, and walked with a limp. While at the Legion, Smith gave Corey a "hateful look or a stare." Corey also saw Smith and Foster looking and nodding toward him and Victor. After about 10 minutes, Smith and Foster left the Legion.

Later that evening, Victor attempted to stop a fight in the parking lot. When Corey noticed that Victor turned his head, Corey turned his head to see what caught Victor's attention. He

saw that Smith and Foster had returned and were only about 6 or 7 feet away. They had switched hooded sweatshirts. Smith was now wearing the gray hooded sweatshirt, and Foster was wearing the black hooded sweatshirt.

Corey testified, "I [saw] like a gesture and then I turned real quick and I could just see a flash." The gesture was "like maybe they [were] caught off guard, or it was a movement." Corey said that when Smith made the gesture, he did not see Smith with a gun. Corey saw "fire" and heard "a loud boom" coming from the direction of Foster, consistent with a "bigger handgun." Corey began to run between the cars in the parking lot, but he stopped because he had been shot in the leg.

During cross-examination by Foster, Corey testified that he picked Smith out of a photographic lineup but could not identify Foster. Foster later attempted to impeach Corey with his prior statements to police that he saw Smith hand Foster a gun and that Smith was wearing a black hooded sweatshirt. When Foster asked Corey whether he told police that "Don Don" had brandished a gun at Victor 2 weeks prior to the shooting, Corey responded, "I can't recall."

Smith similarly questioned Corey about the person referred to as "Don Don" who threatened Victor with a firearm. Smith also questioned Corey about testifying for the federal government and receiving threats from individuals other than Smith.

### (c) Shampagne Swift

Shampagne Swift was at the Legion the evening of the shooting and saw Smith and another individual. She had not seen the individual with Smith before, but testified that he had a black hooded sweatshirt, light skin, and braids. When Smith and the individual with him left the bar, they went past the table where Corey and Victor were seated. Later, as Shampagne was walking toward her mother's house, she heard shots.

### (d) Martini Swift

At trial, Martini Swift testified that she saw Smith enter the Legion, but that she did not see anyone enter the Legion with Smith. Then, the State impeached Martini with her statement to police that Smith walked into the Legion with a "light-skinned boy" wearing braids and a gray hooded sweatshirt.

### (e) Tameaka Smith

Tameaka Smith was in her van in the Legion parking lot when the gunshots began. She saw someone in a black hooded sweatshirt shooting a gun from either a crouching position or a shooter's stance. She said the shooter was skinny and taller than her. She testified she was about 5 feet 6 inches or 5 feet 7 inches tall.

During cross-examination, Foster elicited testimony from Tameaka that she did not consider Foster to be skinny. On cross-examination by Smith, Tameaka stated that she did not remember telling the police that the photograph the police showed her of Smith did not depict the person she saw. Neither did she remember if she saw someone next to the shooter.

### (f) Tenisha Bennett

Tenisha Bennett was less than 5 feet from Victor as he was trying to break up the fight in the parking lot. When the shooting began, she turned and saw a person standing close to Victor and pointing a gun at him. The man with the gun was wearing a black coat with a hood pulled far over his face. It was possible someone else was standing next to the shooter, but the shooter seemed to be alone. Tenisha's look at the shooter was brief. She knew Foster, but stated that she did not see him at the Legion that evening.

### (g) Jacqueline Edwards

Jacqueline Edwards testified that Smith was a friend of Victor's, but that Smith stopped associating with Victor after Victor's release from prison. The night of the shootings, she saw Smith come into the Legion wearing a black hooded sweatshirt. He was accompanied by a light-skinned male who was wearing a gray hooded sweatshirt and had his hair in two long pigtails. Jacqueline later identified the man accompanying Smith and wearing the gray hooded sweatshirt as Foster. As Jacqueline left the Legion on November 10, 2008, she heard five or six gunshots.

On cross-examination by Foster, Jacqueline testified that she had previously told the police who she thought had committed the shooting. The name she gave the police was not Foster's.

### (h) Tamela Henderson

Tamela Henderson left the bar with Victor, Corey, and a few others. She was walking back toward the bar when she received a telephone call. As she walked and talked on her cell phone, she was forced to sidestep two men. She saw their faces; one was Smith, and the other was a person she had seen in the bar earlier. They were wearing the same hooded sweatshirts they had been wearing in the bar. Smith had a gun in his hand. She did not see Foster with a gun.

Tamela heard gunfire a few seconds later but did not see the shooter. She ran to the door of the bar, someone let her in, and she stayed until the gunshots stopped.

After the shooting, Tamela went to where Victor was lying. She recalled screaming, "It was D-Wacc," because Smith was "standing there with the gun, so I figured that it was him." She did not actually see the shooter. She told police that night that Foster was not the shooter.

On cross-examination by Foster, Tamela said that Smith had on the same dark-colored hooded sweatshirt as he wore inside the bar. The other person had on the light-colored hooded sweatshirt. She did not see the person in the light-colored sweatshirt with a gun.

During cross-examination by Smith, Tamela was asked about a statement she made to police in April 2007 which implicated Smith in a different shooting. She admitted she had not seen Smith commit the shooting in that incident.

### (i) Tequila Bennett

Tequila Bennett was present when Smith and Foster came to the Legion. Smith wore a dark-colored hooded sweatshirt, and Foster wore a gray hooded sweatshirt. Foster took his hood off long enough for Tequila to see that he had braids in his hair.

Later, Tequila was with Tamela when Tamela had to sidestep Smith and Foster outside the bar. Smith and Foster were wearing the same hooded sweatshirts they had worn inside the bar. Smith was taking a gun from his waistband with his right hand. Tequila was at the front door of the bar when she heard gunshots. She looked back in the direction of the gunfire and saw Smith firing the gun. She did not see Foster fire a gun.

Smith impeached Tequila with statements she had previously made to police and statements she had made at a deposition. Foster did not request a limiting instruction.

### (j) Terrance Edwards

Terrance Edwards was at the Legion 1 week before the shooting when Smith spoke to Victor. Terrance testified without objection that he heard Smith say to Victor, "[W]e don't fuck with your kind." At trial, Foster did not object to this testimony or request a limiting instruction.

On the night of the shooting, Terrance saw Smith and Foster come into the bar. Smith wore a black hooded sweatshirt and Foster wore a gray hooded sweatshirt. Foster walked with a limp. After leaving the bar, Terrance saw Victor stopping a fight. Smith and Foster arrived at the scene. Terrance testified that the two had switched hooded sweatshirts, so Smith wore the gray hooded sweatshirt, and Foster wore the black hooded sweatshirt. They were both wearing their hoods up.

Terrance watched as Foster shot Victor. Terrance ran between cars and saw Smith and Foster chasing Corey. Foster limped after Smith as the two ran away. Terrance then realized he had been shot.

On cross-examination by Smith, Terrance remembered telling police that the person wearing the black hooded sweatshirt had ponytails. Terrance told police he was sure that the shooter was the person with braids in the black hooded sweatshirt.

### (k) Sandra Denton

Assistant U.S. Attorney Sandra Denton testified concerning a trial in which Smith testified he was a "40th Avenue Crip" and had been for 10 years. Over Smith's objection, Denton stated that Smith testified that "gang members do carry guns and they do shoot them." She testified that Smith said that "they do fire guns at each other." Denton testified that Smith also said: "[I]f you were a snitch, it would be dangerous for you on the street." Foster did not object to Denton's testimony about Smith's previous statements or request a limiting instruction.

### (l) Christopher Spencer

Det. Christopher Spencer conducted approximately 26 interviews for the case. He testified that Smith told him that he was at the Legion by himself on the night of the shooting and that he "had nothing to do with that."

Foster attempted to elicit impeachment evidence against Corey. When Smith cross-examined Spencer, he also attempted to impeach Corey.

## 4. Jury Instructions

Following closing arguments, the court instructed the jury. Outside the presence of the jury, the court asked the parties if they wanted to sequester the jury. Each of the parties replied that they did not request sequestration, and each of the defendants personally verified that they did not seek sequestration.

## 5. Verdicts and Sentences

The jury convicted both Smith and Foster on all counts. Both were sentenced to life imprisonment for first degree murder, 40 to 50 years' imprisonment for use of a deadly weapon to commit murder, 4 to 5 years' imprisonment for each assault, and 10 to 20 years' imprisonment for each use of a deadly weapon to commit assault. Because the sentences were consecutive, Foster's total sentence was life imprisonment plus 96 to 150 years. He received credit for 734 days served.

Foster appeals his convictions. We have a statutory obligation to hear all appeals in cases where the defendant is sentenced to life imprisonment. See Neb. Rev. Stat. § 24-1106(1) (Reissue 2008).

## III. ASSIGNMENTS OF ERROR

Foster assigns that the district court erred in (1) failing to sever his trial from Smith's and (2) allowing the jury to separate without obtaining a voluntary, knowing, and intelligent waiver of his right to sequester the jury.

## IV. ANALYSIS

### 1. Severance of Trials

Foster claims that the district court abused its discretion by failing to sever his trial from Smith's.

### (a) Principles of Law

[1-3] There is no constitutional right to a separate trial. *State v. McPherson*, 266 Neb. 715, 668 N.W.2d 488 (2003). The right is statutory and depends upon a showing that prejudice will result from a joint trial. *Id*. The burden is on the party challenging a joint trial to demonstrate how and in what manner he or she was prejudiced. *Id*. A trial court's ruling on a motion for consolidation of prosecutions properly joinable will not be disturbed on appeal absent an abuse of discretion. *Id*.

In Nebraska, the joinder of defenses is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2008), which states, in relevant part:

> (2) The court may order two or more . . . informations . . . to be tried together if the offenses could have been joined in a single . . . information . . . or if the defendants, if there is more than one, are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. The procedure shall be the same as if the prosecution were under such single . . . information . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an . . . information . . . or by such joinder of offenses in separate . . . informations . . . for trial together, the court may order an election for separate trials of counts [or] informations . . . grant a severance of defendants, or provide whatever other relief justice requires.

[4] As this court has interpreted § 29-2002,

> [t]he propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.

*McPherson*, 266 Neb. at 723, 668 N.W.2d at 497.

The subsections of § 29-2002 governing joinder are similar to the federal rule for joinder found in Fed. R. Crim. P. 8(a)

and (b). The subsection of § 29-2002 allowing for severance is also comparable to the federal rule governing severance. See Fed. R. Crim. P. 14(a). Because of these similarities between the state and federal rules relating to severance of previously joined trials, we find federal case law to be instructive in determining when severance should be granted.

[5] Under federal case law interpreting rule 14(a), the federal equivalent of § 29-2002(3), a court "should grant a severance . . . only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." *Zafiro v. United States*, 506 U.S. 534, 539, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). Prejudice serious enough to meet this standard may occur "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant," when "many defendants are tried together in a complex case and they have markedly different degrees of culpability," when "essential exculpatory evidence that would be available to a defendant tried alone were unavailable in a joint trial," or in other situations. *Id*.

[6,7] Under this rule, a defendant seeking severance must meet a high burden. When the parties are before a trial court, "it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." 506 U.S. 540. Rather, to prevail on a severance argument, a defendant "must show 'compelling, specific, and actual prejudice from [the] court's refusal to grant the motion to sever.'" *U.S. v. Driver*, 535 F.3d 424, 427 (6th Cir. 2008) (quoting *U.S. v. Saadey*, 393 F.3d 669 (6th Cir. 2005)). Stated another way, "a defendant must show that the joint trial caused him such compelling prejudice that he was deprived of a fair trial." *U.S. v. Hill*, 643 F.3d 807, 834 (11th Cir. 2011). There is a preference for joint trials. See *Zafiro, supra*.

Even once prejudice is shown, a defendant is not entitled to severance. See *id*. The federal rule governing severance "leaves the determination of risk of prejudice and any remedy that may be necessary to the sound discretion of the district courts." 506 U.S. at 541. "When the risk of prejudice is high,

a district court is more likely to determine that separate trials are necessary, but . . . less drastic measures, such as limiting instructions, often will suffice to cure any risk of prejudice." 506 U.S. at 539.

[8] On appeal, "'[a] denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown.'" *U.S. v. Bauer*, 551 F.3d 786, 791 (8th Cir. 2008) (quoting *U.S. v. Noe*, 411 F.3d 878 (8th Cir. 2005)). An appellate court "will find such an abuse only where the denial caused the defendant 'substantial prejudice . . . amounting to a miscarriage of justice.'" *U.S. v. O'Connor*, 650 F.3d 839, 859 (2d Cir. 2011) (quoting *United States v. Bari*, 750 F.2d 1169 (2d Cir. 1984)). The Eighth Circuit has found that the denial of a motion to sever will be reversed only when denying severance "'resulted in severe or compelling prejudice.'" *U.S. v. Mann*, 685 F.3d 714, 718 (8th Cir. 2012) (quoting *U.S. v. Rimell*, 21 F.3d 281 (8th Cir. 1994)). "'Severe prejudice occurs when a defendant is deprived of an appreciable chance for an acquittal'" that would have existed in a separate trial. *Id*. (quoting *U.S. v. Garrett*, 648 F.3d 618 (8th Cir. 2011)).

### (b) Additional Facts

In February 2010, the State filed a motion to consolidate Smith's and Foster's trials. Smith and Foster both objected to consolidation, but the district court sustained the State's motion. On April 9, it consolidated the trials.

Shortly thereafter, Smith moved to sever, and the district court granted severance. The court severed the trials because it was concerned that allowing testimony that Foster said Smith directed him to kill Victor would violate Smith's right to confrontation. Foster could not be compelled to testify.

The State moved for reconsideration, claiming such evidence would not be presented. Upon this motion, the district court reconsolidated the cases for trial.

Before trial, both Smith and Foster moved to sever. Foster claimed both defendants would "point the finger" at each other. Smith claimed the defendants' defenses were antagonistic, conflicting, and mutually exclusive. He argued that as a consequence, evidence would be presented in a joint trial

that would not be admitted in his separate trial. The court overruled the motions. Before the presentation of evidence, both defendants again moved to sever and both motions were overruled.

### (c) Resolution

As noted above, under Nebraska law, we must consider two questions when determining the propriety of a joint trial: "whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial." *State v. McPherson*, 266 Neb. 715, 723, 668 N.W.2d 488, 497 (2003).

Foster does not argue that his and Smith's trials were improperly consolidated. Neither do we find that the initial consolidation of the trials was error. The charges against both Smith and Foster relate to their alleged involvement in Victor's death. Consolidation is proper if the offenses are part of a factually related transaction or series of events in which both of the defendants participated. *Id*. Accordingly, the charges against Smith and Foster could have been consolidated in a single information and the first requirement for joinder has been satisfied.

Foster attacks his joint trial with Smith by arguing that the second requirement for proper joinder was not satisfied, because he was prejudiced by the joint trial. In support of his claim that he was prejudiced by being tried jointly with Smith, Foster advances three arguments: (1) that his defense was irreconcilable with and mutually exclusive of Smith's; (2) that the court admitted hearsay statements made by Smith that would have been inadmissible if Foster had been tried separately; and (3) that admitting Smith's hearsay statements violated his right to confront the witnesses against him, because Smith did not testify at trial. We consider each argument in turn.

### (i) Mutually Exclusive Defenses

[9] The existence of mutually antagonistic defenses is not prejudicial per se. See *Zafiro v. United States*, 506 U.S. 534,

113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). Therefore, even a defendant who is arguing that the existence of mutually exclusive or antagonistic defenses resulted in prejudice entitling him or her to severance must meet the high burden of showing that "joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539.

This already "heavy burden" becomes "correspondingly heavier when, on appeal, [joint defendants] seek to demonstrate that the district court abused its discretion by declining to [grant severance]." *U.S. v. Daniels*, 281 F.3d 168, 177 (5th Cir. 2002). We find that Foster has not met this heavy burden on appeal of showing an abuse of discretion by the district court in not severing his and Smith's trials due to their conflicting defenses.

In an attempt to show that the district court abused its discretion, Foster claims that his and Smith's defenses were mutually exclusive and that this fact "in and of itself, 'prevent[ed] the jury from making a reliable judgment about guilt or innocence.'" Brief for appellant at 25 (quoting *Zafiro, supra*). He argues that his and Smith's defenses were mutually antagonistic because their joint trial was factually parallel to that of the codefendants in *U.S. v. Tootick*, 952 F.2d 1078 (9th Cir. 1991), in which case the Ninth Circuit determined that the existence of mutually exclusive defenses was so prejudicial as to require severance. We do not agree that Smith and Foster had mutually exclusive defenses sufficient to require severance under *Tootick* or any other precedent.

In *Tootick, supra*, a man was stabbed while drinking with two other individuals. The two men with whom the victim was drinking when stabbed became codefendants, one of which was Moses Tootick. At trial, each defendant blamed the other. Tootick claimed he was highly intoxicated or unconscious during the stabbing. The other defendant, Charles Frank, testified that he watched Tootick repeatedly stab the victim. The two codefendants were the only people present when the victim was attacked, and to acquit one defendant, the jury had to convict the other defendant. The Ninth Circuit concluded on appeal that the two codefendants' defenses were

mutually exclusive. The Ninth Circuit explained its conclusion that the codefendants' defenses were mutually exclusive as follows:

> Because only Frank and Tootick were present when [the victim] was attacked, and because there was no suggestion that [the victim] injured himself, the jury could not acquit Tootick without disbelieving Frank. Each defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other.

*Id.* at 1081.

Having found that the codefendants in *Tootick* had mutually exclusive defenses, the Ninth Circuit considered whether this fact entitled them to separate trials.

Ultimately, the Ninth Circuit found that Tootick and Frank had demonstrated sufficiently manifest prejudice from their mutually exclusive defenses to entitle them to separate trials. It rested this conclusion on "the number and types of prejudicial incidents that were not corrected by instructions from the court." *Id.* at 1083. It reversed both defendants' convictions.

[10] *Tootick* is one of the few federal cases in which mutually antagonistic defenses have been found to result in sufficient prejudice to require severance. See *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). On the whole, the federal circuit courts have repeatedly found that defenses that are based on "finger pointing" do not result in prejudice sufficient to mandate severance. See, e.g., *U.S. v. Dinkins*, 691 F.3d 358 (4th Cir. 2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 1278, 185 L. Ed. 2d 214 (2013); *Hardy v. Commissioner, Ala. Dept. of Corrections*, 684 F.3d 1066 (11th Cir. 2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 2768, 186 L. Ed. 2d 221 (2013); *U.S. v. Plato*, 629 F.3d 646 (7th Cir. 2010); *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010); *U.S. v. Nichols*, 416 F.3d 811 (8th Cir. 2005); *U.S. v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004); *U.S. v. Hughes*, 310 F.3d 557 (7th Cir. 2002); *U.S. v. Johnson*, 297 F.3d 845 (9th Cir. 2002); *Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000); *U.S. v. Gilliam*, 167 F.3d 628 (D.C. Cir. 1999); *U.S. v. Throckmorton*, 87 F.3d 1069 (9th Cir. 1996). As the

Fourth Circuit has noted, "Hostility among defendants, and even a defendant's desire to exculpate himself by inculpating others, do not of themselves qualify as sufficient grounds to require separate trials." *Dinkins*, 691 F.3d at 369. "Blame-shifting on the part of the defendants 'is not a sufficient reason for severance.'" *Nichols*, 416 F.3d at 817 (quoting *U.S. v. Basile*, 109 F.3d 1304 (8th Cir. 1997)). Neither does "[t]he fact that a defendant or his attorney is 'a de facto prosecutor who will shift blame from himself to [co-defendants] justif[y] severance." *Blankenship*, 382 F.3d at 1126 (quoting *U.S. v. Andreas*, 23 F. Supp. 2d 835 (N.D. Ill. 1998)). Rather, in order to be entitled to severance based on mutually exclusive defenses, "the defendant must show real prejudice, rather than merely note that each defendant is trying to exculpate himself while inculpating the other." *Fox*, 200 F.3d at 1293.

We are not presented with a factual situation comparable to that in *U.S. v. Tootick*, 952 F.2d 1078 (9th Cir. 1991), such that we must conclude based on that case that Smith's and Foster's defenses were so mutually exclusive so as to entitle them to severance. The situation in the instant case is distinguishable because the jury was presented with a scenario where it could acquit one defendant based on his defense of innocence without simultaneously rejecting the defense of the other.

In *Tootick*, each defendant asserted his innocence and accused the other. Because no persons besides the two codefendants and the victim were present at the time of the stabbing, one of the defendants must have committed the stabbing. Thus, if the jury believed one defendant's defense that he was innocent, such belief necessarily led to the conclusion that the other defendant's defense was false and that he stabbed the victim. Once the jury believed one defendant's defense, it was not required to find the other defendant guilty; it was precluded from believing both defendants' claims of innocence, because one of them had to have stabbed the victim.

The same cannot be said of the current case, because the details of the shooting did not dictate that Smith or Foster were the only possible shooters. Instead, the jury could believe both Smith's and Foster's defenses that they did not commit the shooting and find that yet a third individual was the actor. In

short, unlike in *Tootick*, where the outcomes were limited to two, there were multiple outcomes in this case.

We first note that there was evidence implicating Foster as the shooter. At least two witnesses testified they saw Foster approach and shoot Victor. Corey saw Smith and Foster in the parking lot 6 to 7 feet away. At that time, Foster had on the black hooded sweatshirt and Smith wore the gray. Corey saw a gesture from Smith or that his hand was "going up." About the same time, Corey saw "fire" from Foster's hand and heard a loud boom. Terrance testified he saw Smith and Foster approach Corey and Victor. Smith and Foster had switched sweatshirts, and Foster wore the black hooded sweatshirt. He saw Foster with his hand out, and "fire" came from his hand when Terrance heard gunshots.

There was conflicting evidence that Smith committed the shooting. Specifically, Tequila claimed Smith was the shooter. Therefore, based on the testimony of either Corey and Terrance or Tequila, the jury could have convicted one defendant and acquitted the other. But these were not the sole possible outcomes of this case, as was the case in *Tootick, supra*.

There was also evidence to support the State's claim that Foster shot Victor and that Smith aided and abetted Foster in the commission of the shootings. The State offered evidence that both defendants participated in the crime. It elicited testimony that Foster initially wore a gray hooded sweatshirt, but that he had switched sweatshirts with Smith by the time of the shooting so that he was wearing the black sweatshirt. At least one witness testified that the shooter was wearing black and was skinny. This evidence identified Foster as the shooter. Significantly, however, there was also evidence that Smith handed Foster the gun just before the shooting.

[11-13] Under the State's theory of prosecution, the jury could evaluate the evidence as to each defendant. The fact that one codefendant was defending against the charge of aiding and abetting the other codefendant in committing the underlying crime does not necessarily create mutually exclusive defenses. Aiding and abetting is simply another basis for holding an individual liable for the underlying crime. See *State v. Kitt*, 284 Neb. 611, 823 N.W.2d 175 (2012). "By its terms,

[Neb. Rev. Stat.] § 28-206 [(Reissue 2008)] provides that a person who aids or abets may be prosecuted and punished as if he or she were the principal offender." *Kitt*, 284 Neb. at 634, 823 N.W.2d at 192. No particular acts are necessary, nor is it necessary that the defendant take physical part in the commission of the crime or that there was an express agreement to commit the crime. *Id*.

Smith was charged with first degree murder, but prosecuted on an aiding and abetting theory. As such, the jury could find him guilty without determining that he was the shooter. Indeed, the State offered evidence of each defendant's individual role in the shooting. This evidence supported the conclusion that Smith handed the gun to Foster, who then shot the victims. Based on this evidence, the jury could have found both Smith and Foster guilty of the respective crimes with which they were charged.

There was also evidence adduced at trial that would support the opposite conclusion—that neither defendant was present at the time of the shooting. Smith and Foster were not the only persons present at the crime. And at trial, they suggested someone else could be responsible for the shooting, including "Don Don" or a person named "Views."

Based on the evidence at trial, the jury could conclude that Foster committed the shootings alone, that Smith committed the shootings alone, that Smith and Foster committed the shootings together, or that neither Foster nor Smith committed the shootings. It could believe Foster's defense that he was not the shooter without being compelled to find that Smith was the shooter. Likewise, the jury could believe Smith's defense that he was not the shooter without necessarily having to find that Foster was the shooter. Thus, Smith and Foster did not have mutually exclusive defenses as defined in *U.S. v. Tootick*, 952 F.2d 1078 (9th Cir. 1991).

Neither were Smith's and Foster's defenses sufficiently antagonistic to merit severance under the more recent case law interpreting *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993). Recall that under *Zafiro*, only two kinds of real prejudice entitle a defendant to severance. The joint trial must either "compromise a specific trial right"

or "prevent the jury from making a reliable judgment about guilt or innocence." 506 U.S. at 539.

Foster alleges that his and Smith's joint trial was an example of a situation in which antagonistic defenses prevented a reliable jury verdict because "his trial became a contest between codefendants." Brief for appellant at 35. Specifically, he argues that the joint trial reduced the State's burden of proof by pitting Smith and Foster against each other. As examples of how this occurred, Foster points out the following facts: (1) Each defendant claimed the other was the shooter in opening statements; (2) Smith attempted to impeach Tequila and Tamela, both of whom provided testimony that implicated Smith and not Foster as the shooter; (3) both defendants used the testimony of Spencer to confirm testimony helpful to his case and impeach witnesses detrimental to his case; (4) Smith called a witness who saw a man with braids running from the scene; (5) both defendants "returned to their primary strategy of prosecuting each [other]" in closing arguments, *id*. at 31; and (6) the State exploited the contest between Smith and Foster in its rebuttal argument.

These facts do not, however, point out any aspect of Smith's and Foster's defenses other than that they constituted "finger pointing." As previously noted, "finger pointing" alone does not create mutually exclusive defenses sufficient to require separate trials. See, e.g., *U.S. v. Dinkins*, 691 F.3d 358 (4th Cir. 2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 1278, 185 L. Ed. 2d 214 (2013); *Hardy v. Commissioner, Ala. Dept. of Corrections*, 684 F.3d 1066 (11th Cir. 2012), *cert. denied* ___ U.S. ___, 133 S. Ct. 2768, 186 L. Ed. 2d 221 (2013); *U.S. v. Plato*, 629 F.3d 646 (7th Cir. 2010); *U.S. v. Lighty*, 616 F.3d 321 (4th Cir. 2010); *U.S. v. Nichols*, 416 F.3d 811 (8th Cir. 2005); *U.S. v. Blankenship*, 382 F.3d 1110 (11th Cir. 2004); *U.S. v. Hughes*, 310 F.3d 557 (7th Cir. 2002); *U.S. v. Johnson*, 297 F.3d 845 (9th Cir. 2002); *Fox v. Ward*, 200 F.3d 1286 (10th Cir. 2000); *U.S. v. Gilliam*, 167 F.3d 628 (D.C. Cir. 1999); *U.S. v. Throckmorton*, 87 F.3d 1069 (9th Cir. 1996).

Furthermore, this federal case law is consistent with Nebraska case law, which contains a similar principle. This court has held that "[t]he mere claim that defenses of codefendants are

antagonistic is insufficient reason to grant separate trials where the charges against all the defendants result from the same series of acts and would be proved by similar evidence." *State v. Pelton*, 197 Neb. 412, 419, 249 N.W.2d 484, 488 (1977), *abrogated on other grounds, State v. Morris*, 251 Neb. 23, 554 N.W.2d 627 (1996) (citing *State v. Rice*, 188 Neb. 728, 199 N.W.2d 480 (1972). Smith and Foster were both being tried for their involvement in the same shooting that occurred on November 10, 2008. Therefore, the mere claim of antagonistic defenses is not a sufficient reason for separate trials under either Nebraska or federal case law.

Aside from failing to establish the likelihood of an unreliable verdict, the facts identified by Foster also fail to demonstrate that the State's burden was reduced by Smith's and Foster's conflicting defenses during the joint trial. Despite the fact that Smith and Foster both attempted to prove their own innocence by implicating each other, the State still adduced sufficient evidence for the jury to find Foster guilty of directly shooting Victor and Smith guilty for aiding and abetting Foster in the shooting. The evidence outlined above in our discussion of mutually exclusive defenses was more than sufficient to support guilty verdicts against both defendants.

Foster has failed to show that the State's burden was decreased or that the jury's verdicts were somehow unreliable due to the joint trial. And in his argument on mutually exclusive defenses, Foster does not allege that the joint trial violated any of his specific trial rights. Thus, he has failed to establish real prejudice resulting from his and Smith's defenses as required by *Zafiro v. United States*, 506 U.S. 534, 113 S. Ct. 933, 122 L. Ed. 2d 317 (1993).

Foster's first argument does not persuade us that he was prejudiced by the joint trial or that the court abused its discretion in denying severance.

### (ii) Smith's Statements as Inadmissible Hearsay

In his next argument, Foster contends the district court admitted statements made by Smith that would have been inadmissible hearsay had Foster been tried separately. He claims

the court did not instruct the jury to consider these statements only as evidence of Smith's guilt.

### a. Additional Facts

The first statement at issue was made by Smith at the party in October 2008. Corey testified that at the party, Corey saw Smith for the first time since Corey had been released from federal prison. After Corey acknowledged Smith, Smith said, "We don't fuck with your kind." Because of Smith's presence, Corey and Victor left the party after about 10 to 15 minutes. Foster did not object to Corey's testimony about Smith's statement or request a limiting instruction.

Smith made the second statement at issue 2 weeks before the shootings. Corey testified that he walked out of the Legion to find Victor standing outside their car surrounded by a group of men including Smith, several of whom had guns. Smith told Corey, "We don't fuck with y'all kind. They ain't tripping off that other stuff. We just don't fuck with y'all kind." Corey testified that he understood Smith to be commenting that he and Victor were "snitches." Terrance, who was also present, testified that he heard Smith say to Victor, "[W]e don't fuck with your kind." Foster did not object to any of this testimony or request a limiting instruction.

Smith made the final statements at issue during his trial testimony in a prior and separate proceeding. At the trial in the instant case, an assistant U.S. Attorney, Denton, testified that she prosecuted a case where Smith "testified that he was a 40th Avenue Crip and had been so for ten years." She also said that Smith made the following statements during his testimony in the prior proceeding: (1) that gang members carry and shoot guns; (2) that gang members fire guns at each other; (3) that it was a negative thing to be a "snitch"; and (4) that if you were a "snitch," it would be dangerous for you on the street. Foster did not object to Denton's testimony or request a limiting instruction.

### b. Resolution

[14] For the purpose of clarification, we note that Foster does not assign that the district court erred in admitting

Smith's statements because they constituted hearsay in the context of the joint trial. Foster did not object when Corey, Terrance, and Denton testified at trial to Smith's statements. Neither did he request limiting instructions regarding their testimony. The failure to make a timely objection waives the right to assert prejudicial error on appeal. *State v. Almasaudi*, 282 Neb. 162, 802 N.W.2d 110 (2011). Because Foster did not raise a hearsay objection or request a limiting instruction regarding Smith's statements, he waived any argument that the statements were hearsay and that the court erred in admitting Smith's statements in the joint trial.

Consistent with this waiver, Foster does not argue that the admission of Smith's statements in the joint trial was trial error. Rather, Foster identifies the admission of the statements as proof that he was prejudiced by the joint trial. Foster argues that Smith's prior statements would not have been admitted if he were tried separately and that the court therefore abused its discretion in not severing the trials.

[15] The question before this court thus is whether the statements would have been admissible if Foster had been tried separately from Smith. Foster claims that they would not have been admissible in a separate trial because they would have been hearsay. "Hearsay is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted . . . ." Neb. Evid. R. 801(3), Neb. Rev. Stat. § 27-801(3) (Reissue 2008). Hearsay statements are inadmissible under Neb. Evid. R. 802, Neb. Rev. Stat. § 27-802 (Reissue 2008). We do not agree with Foster, but find that Smith's statements would have been admissible against Foster in a separate trial.

### *i. Smith's Statements to*
### *Corey and Victor*

[16] Smith's statements to Corey and Victor would not have been inadmissible in a separate trial under the hearsay rule because they were not offered for the truth of the matter asserted. An extrajudicial statement not offered to prove the truth of the matter asserted is not hearsay. *State v. Hansen*,

252 Neb. 489, 562 N.W.2d 840 (1997). Smith's statements to Corey and Victor would have been offered for their truth if they had been used to prove that Smith literally did not "fuck" with Corey and Victor's "kind." That was not the case. Rather, in the joint trial, the statements were offered to prove something other than their truth—Smith's then-existing state of mind—and were therefore not excluded by the hearsay rule for the reason that they were not hearsay. If the State had offered Smith's statements for the same purpose in a separate trial, the statements would not have been offered for the truth of the matter asserted and thus would not have been hearsay.

Other courts have also admitted out-of-court statements which showed the existing state of mind of the declarant. *State v. Davis*, 62 Ohio St. 3d 326, 581 N.E.2d 1362 (1991), involved the prosecution of a person employed to commit murder for hire. The court held the statement of the alleged employer of the defendant that he was going to "get even" with the victim, whom the employer believed had set him up for an arrest, was admissible to show the then-existing state of mind of the employer. *Id*. at 343, 581 N.E.2d at 1377. In *People v Paintman*, 92 Mich. App. 412, 285 N.W.2d 206 (1979), *reversed on other grounds* 412 Mich. 518, 315 N.W.2d 418 (1982), the codefendant made threats against one of the homicide victims. The court held the codefendant's state of mind was relevant to his intent in killing the victims and therefore to the defendant's guilt as an aider and abettor.

In conclusion, given the purposes for which the State admitted Smith's statements to Corey and Victor, the statements did not constitute hearsay in the joint trial and would not have been hearsay in a separate trial. Smith's statements could have been used in a separate trial of Foster to show Smith's then-existing state of mind or to demonstrate that Smith and Foster did not randomly appear at the Legion and shoot five people, thereby completing the story that Smith aided and abetted Foster in the shootings. Because the statements would not have been hearsay when offered for such a purpose, they would not have been inadmissible in a separate trial.

### ii. Smith's Prior
### Trial Testimony

Foster claims Denton's testimony regarding Smith's statements made in a prior trial would have been inadmissible in a separate trial. We agree that this testimony would have been inadmissible in a separate trial, but do not find that the admission of these statements showed that Foster was unfairly prejudiced by the joint trial.

Smith's testimony that he was a gang member, that gang members shoot guns at each other, and that it was dangerous on the street to be a "snitch" was offered for its truth and was hearsay with respect to Foster. As hearsay, this evidence would not have been admissible in a separate trial.

But the admission of these statements about gangs was not so unfairly prejudicial that the court abused its discretion in not severing the trials. We do not find manifest prejudice in the admission of Smith's prior trial testimony for two reasons. First, Smith's testimony from a previous trial did not mention or implicate Foster. Indeed, other witnesses testified to Foster's presence at the Legion and his involvement in the shooting. Other witnesses also provided testimony showing that Corey and Victor were "snitches" and that they had been threatened. Second, it is common knowledge that gang members have guns, that gang members use guns, and that it was dangerous to be a "snitch." For these reasons, the testimony of Smith's statements in a previous proceeding was not so manifestly prejudicial as to require that the defendants be tried separately.

### (iii) Confrontation Clause

In support of his first assignment that the district court erred in not severing the trials, Foster argues that the joint trial resulted in prejudice because the admission of Smith's statements in the joint trial violated Foster's rights under the Confrontation Clause. He argues as follows: "Here, the district court's decision to force the defendants into a joint trial prejudiced Foster by compromising his constitutional right to cross-examine Smith concerning the hearsay statements introduced by the State." Brief for appellant at 38. As a joint defendant, Smith did not testify during the joint trial.

a. Principles of Law

[17] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. An appellate court reviews de novo a trial court's determination of the protections afforded by the Confrontation Clause of the Sixth Amendment to the U.S. Constitution and reviews the underlying factual determinations for clear error. *State v. Watson*, 285 Neb. 497, 827 N.W.2d 507 (2013).

In *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004), the U.S. Supreme Court determined that the Sixth Amendment prohibited the admission of testimonial statements against an accused unless the person who made the statements was unavailable and the accused had a prior opportunity for cross-examination. Michael Crawford was accused of stabbing a man who allegedly attempted to rape his wife. Under police interrogation, Crawford's wife made a statement indicating the victim did not have a weapon in his hand. Crawford's wife did not testify because of marital privilege, but her statement was presented to the jury. The jury convicted Crawford of assault. Crawford had claimed self-defense at trial.

On appeal, the U.S. Supreme Court determined the Sixth Amendment barred admission of statements that were testimonial, absent unavailability of the witness and a prior opportunity for cross-examination. The Court did not give an exhaustive definition of a testimonial statement, but statements given as prior testimony at a preliminary hearing, testimony given before a grand jury, testimony in a former trial, and statements from police interrogations were clearly testimonial. The circumstances in which the statement was made were important in determining if the statement was testimonial. "An accuser who makes a formal statement to government officers bears testimony in a sense that a person who makes a casual remark to an acquaintance does not." *Crawford*, 541 U.S. at 51. Applying these propositions to the facts in *Crawford*, the Court concluded that the statement of Crawford's wife was testimonial because she made the statement while under police interrogation.

[18] Lower courts have generally determined that statements to friends, relatives, accomplices, and anyone outside the criminal justice system are not testimonial. See Ralph Ruebner & Timothy Scahill, Crawford v. Washington, *the Confrontation Clause, and Hearsay: A New Paradigm for Illinois Evidence Law*, 36 Loy. U. Chi. L.J. 703 (2005). For example, in *Billings v. State*, 293 Ga. 99, 745 S.E.2d 583 (2013), the Georgia Supreme Court determined that statements a codefendant made to his girlfriend were not testimonial. The codefendant made the statements more than 2 weeks before being arrested. The statements were not the product of law enforcement interrogation during an investigation intended to produce evidence for prosecution.

We have employed a similar analysis to determine when a statement is testimonial. See *State v. Vaught*, 268 Neb. 316, 682 N.W.2d 284 (2004). In *Vaught*, we noted that the U.S. Supreme Court provided three possible definitions of a testimonial statement: (1) materials, such as affidavits, where the defendant could not cross-examine and the declarant would reasonably expect the statement to be used for prosecution; (2) extrajudicial statements in formalized testimonial materials such as affidavits, depositions, prior testimony, or confessions; and (3) statements made under circumstances leading an objective witness to reasonably believe the statement would be available for use at a trial.

### b. Resolution

#### i. Smith's Statements to Corey and Victor

[19] A statement that is not intended for use in the prosecution of a crime and that law enforcement had no role in obtaining is not testimonial. See *id*. Smith did not anticipate that his statements at the October 2008 party and at the Legion 2 weeks before the shooting would be used in a criminal prosecution, and the federal government had nothing to do with the statements. Accordingly, these statements were not testimonial. Because these statements were not testimonial, the Confrontation Clause would not prevent the statements from

being admitted in either a separate trial of Foster or a joint trial of Smith and Foster.

### ii. Smith's Prior
### Trial Testimony

Smith's statements made in a prior trial as related by Denton were testimonial and, therefore, subject to the Confrontation Clause. The term testimonial "applies at a minimum to prior testimony . . . at a former trial." *Crawford v. Washington*, 541 U.S. 36, 68, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004). Denton testified to statements Smith made in a former trial, and the State was involved in producing the statements for prosecution. As such, the statements were testimonial.

Given that Smith's statements in a prior proceeding were testimonial, it was a violation of the Confrontation Clause to admit these statements unless Foster had a prior opportunity to cross-examine Smith. See *id*. Foster did not have an opportunity to cross-examine Smith about the statements. Therefore, admitting the testimonial statements in a separate trial of Foster would implicate the Confrontation Clause.

We conclude that although the statements implicated Foster's rights under the Confrontation Clause, their admission was not so prejudicial as to result in an abuse of discretion by the court in not severing the trials. To justify severance, a defendant must show compelling prejudice to the conduct of his or her defense resulting in fundamental unfairness. *U.S. v. Acosta*, 807 F. Supp. 2d 1154 (N.D. Ga. 2011). Smith's general statement that gang members have guns and use them was not specifically directed at Foster and was a fact that would have been known by the jury as a matter of common knowledge. To the extent Smith's prior trial testimony was specific to individuals in the instant case, we note that other witnesses testified that Smith was a member of the 40th Avenue gang, that Corey and Victor were "snitches," and that Corey and Victor had been threatened. For these reasons, we do not find that the admission of Smith's prior trial testimony was so prejudicial as to result in an abuse of discretion by the district court in not severing the trials.

### (d) Conclusion

Foster has raised three arguments that the court abused its discretion in not severing the trials: (1) that his defense was mutually exclusive to that of his codefendant, Smith; (2) that evidence was admitted in the joint trial that could not be admitted against him in a separate trial; and (3) that evidence was presented in the joint trial that violated his right to confrontation. For the aforementioned reasons, we conclude that Foster's arguments are without merit.

### 2. JURY SEQUESTRATION

Foster alleges the district court erred in allowing the jury to separate after the case was submitted without first obtaining his intelligent waiver of his right to sequester the jury.

### (a) Principles of Law

[20,21] Neb. Rev. Stat. § 29-2022 (Reissue 2008) states, in part: "When a case is finally submitted to the jury, [jury members] must be kept together in some convenient place, under the charge of an officer, until they agree upon a verdict or are discharged by the court." We have long held that a defendant can waive the right to sequester the jury. See *Sedlacek v. State*, 147 Neb. 834, 25 N.W.2d 533 (1946). In *State v. Robbins*, 205 Neb. 226, 232, 287 N.W.2d 55, 58 (1980), *overruled, State v. Collins*, 281 Neb. 927, 799 N.W.2d 693 (2011), we established a rule regarding waiver of the statutory right to sequester:

> In the absence of express agreement or consent by the defendant, a failure to comply with [§ 29-2022] by permitting the jurors to separate after submission of the case is erroneous; creates a rebuttable presumption of prejudice; and places the burden upon the prosecution to show that no injury resulted.

In *Collins, supra*, we overruled *Robbins*' holding that a defendant's express agreement or consent is required to waive the right under § 29-2022 to sequester the jury. However, our ruling in *Collins* was prospective only. Foster was tried before *Collins* was decided, and the case at bar is governed by the rule from *Robbins*.

### (b) Additional Facts

After the jury began its deliberations, the following colloquy occurred:

> [The court]: With regard to sequestration of the jury, is there any — do you want the jury sequestered, [prosecutor]?
>
> [Prosecutor]: No, Your Honor. Just by Nebraska statute and case law, it's a right that each defendant has and they have to formally waive it for it not to [be] an error.
>
> THE COURT: [Foster's counsel]?
>
> [Foster's counsel]: We do not seek sequestration of the jury, Your Honor.
>
> THE COURT: [Smith's counsel]?
>
> [Smith's counsel]: Judge, I spoke to . . . Smith about this and he does not wish to have the jury sequestered.
>
> Is that correct, . . . Smith?
>
> DEFENDANT SMITH: Uh-huh.
>
> THE COURT REPORTER: Is that a yes?
>
> [Smith's counsel]: Yes.
>
> DEFENDANT SMITH: Yes.
>
> THE COURT: All right. And that's correct, . . . Foster?
>
> DEFENDANT FOSTER: Yes.
>
> THE COURT: All right. As such, then the jury will not be sequestered.

### (c) Resolution

Foster argues that the district court erred by failing to obtain an intelligent waiver of his right to sequester the jury before allowing the jury to separate. He contends that given our finding in *Robbins, supra*, that § 29-2022 protects more than a mere procedural right, a defendant's waiver of the right to sequester must be voluntary, knowing, and intelligent. He claims formal warnings are required. Basically, Foster alleges that because the district court did nothing to ensure his waiver was voluntary, knowing, and intelligent, it was clearly errone-ous to accept the waiver.

The State argues that the district court specifically asked Foster whether he did not seek sequestration and that he replied

he did not, which satisfied *Robbins*' requirement of express agreement or consent. We agree with the State.

The district court asked Foster's attorney if he sought sequestration. It also asked Foster personally if it was correct that he did not seek sequestration. Foster replied that it was correct that he did not seek sequestration. This met the requirement of *Robbins* that the defendant expressly agrees to waive sequestration. We find no merit to Foster's second assignment of error.

## V. CONCLUSION

Because we find no merit to either of Foster's assignments of error, we affirm his convictions and sentences.

Affirmed.

Inbody, Chief Judge, participating on briefs.
Heavican, C.J., not participating.

———————————

State of Nebraska, appellee, v.
Darrin D. Smith, appellant.
___ N.W.2d ___

Filed November 15, 2013.    No. S-10-1232.

1. **Trial: Joinder: Proof.** There is no constitutional right to a separate trial. The right is statutory and depends upon a showing that prejudice will result from a joint trial.
2. **Trial: Joinder: Indictments and Informations.** The propriety of a joint trial involves two questions: whether the consolidation is proper because the defendants could have been joined in the same indictment or information, and whether there was a right to severance because the defendants or the State would be prejudiced by an otherwise proper consolidation of the prosecutions for trial.
3. **Trial: Joinder: Juries.** A court should grant a severance only if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence.
4. **Trial: Joinder: Proof.** To prevail on a severance argument, a defendant must show compelling, specific, and actual prejudice from the court's refusal to grant the motion to sever.
5. ____: ____: ____. A defendant must show that the joint trial caused him or her such compelling prejudice that he or she was deprived of a fair trial.